## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LLOYD MCDONNAUGH | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| TEVA SPECIALTY | : | |
| PHARMACEUTICALS, LLC | : | No. 09-5566 |

### MEMORANDUM OPINION

**Goldberg, J.**                                                                            **August 31,  2011**

Plaintiff, Lloyd McDonnaugh, has alleged that Defendant, Teva Specialty Pharmaceuticals, LLC ("TSP"), terminated his employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et. seq. ("Title VII") and the Civil Rights Act of 1991, 42 U.S.C. §1981 ("§ 1981").[1]  Plaintiffs basic contention is that his termination was motivated by his race, African American.

Before the Court is Defendant's Motion for Summary Judgment. Because Plaintiff has failed to adduce sufficient evidence to demonstrate: (1) a prima facie case of race discrimination; or (2) that his termination was pretextual, Defendant's motion will be granted.

## I.     FACTUAL & PROCEDURAL HISTORY[2]

In 2006, Plaintiff became aware of a sales opportunity at TSP and applied for the position of Sales Representative.   Prior to joining TSP, Plaintiff had six years experience in the pharmaceutical industry, including work at Merck and Wyeth.   Plaintiff was interviewed by

---

[1] Plaintiff also brings a claim pursuant to the Pennsylvania Human Relations Act, 43 P.S. § 955(a) et seq. ("PHRA").

[2] Unless otherwise indicated, the facts discussed are undisputed.

Regional Sales Manager, Randy Simmons, who is also African American, and was subsequently hired on August 21, 2006 for the position of Overlay Sales Representative.  Simmons was initially his boss, but as explained below, Simmons was later promoted to a different position. According to Plaintiff, his job required that he call upon the higher level physicians within the industry in a variety of sales territories.  (Def's State. Facts, ¶¶ 1-3; Pl.'s State. Facts, ¶¶ 4-7; McDonnaugh Depo., pp. 10-11, 16, 21, 25, 31, 39, 33.)

As a Sales Representative, Plaintiff was primarily responsible for marketing ProAir HFA, which is a short acting beta agonist (rescue inhaler) to be used when a patient has an asthma attack, as well as QVAR, an inhaled corticosteroid prescribed by physicians for the maintenance and treatment of asthma.  TSP provided Plaintiff and the other Sales Representatives with sales training.  (Def.'s State. Facts, ¶¶ 4-7; McDonnaugh Depo., p. 22.)

In 2007, TSP reconfigured the territories in the Philadelphia region and eliminated the Overlay Sales Representative position. Plaintiff was assigned to his own territory, Central Philadelphia, for which he was the sole representative, and he continued to report to Simmons. In this position, Plaintiff was required to develop relationships with physicians, listen to their needs and provide a fit for ProAir and QVAR within their practices.  Plaintiff was also expected to call on pharmacists, using a slightly different sales pitch, to allow them to become familiar with TSP products and the benefits of prescribing them.  (Def.'s State. Facts, ¶¶ 8-11; Pl.'s State. Facts, ¶ 15-16; McDonnaugh Depo., pp. 25-30.)

Plaintiff's performance was reviewed on a monthly and bi-annual basis.  The monthy reviews were known as Field Contact Reviews ("FCRs"), which were completed after a manager accompanied Sales Representatives on sales calls.  Each review rated Sales Representatives with

a numerical rating of one to four.[3]  Simmons was critical of Plaintiff's performance in the areas of selling style and territory management. In his first partial year review, although Plaintiff's physicians showed an increased market share, Plaintiff was criticized for his one-sided sales style, which included excessive dialogue without utilizing probing questions to discover the needs of each physician.  Plaintiff received a "meets expectations" score or a "3" on the overall rating for the partial year 2006.  In 2007, his first full year of employment, Plaintiff received a "mostly meets expectations" in every category or a "2," except for "Integrity and Ethical Conduct," in which he "m[et] expectations."  (Doc. No. 13, Exs. E, F; Def.'s State. Facts ¶¶ 13-15; Pl.'s State. Facts, ¶ 40; McDonnaugh Depo., pp. 34-36, 42-45; Simmons Depo., pp. 21-22.)

Simmons was promoted in November 2007 and Jaylene Penrod, a Caucasian, took over his Regional Manager position. The ten sales representatives who had reported to Mr. Simmons continued to report to Penrod.  Plaintiff was the only African American in this group.  In March 2008, Penrod prepared her first FCR for Plaintiff, and she reported that Plaintiff did not have a concise and strong sales message, failed to use probing questions and used excessive one-sided dialogue.  Furthermore, his sales results for QVAR during the first quarter were lower than the regional, area and national averages. For ProAir, his other product, his sales results were either the same or slightly below the regional, area and national averages.  (Doc. No. 13, Ex. G; Def.'s State. Facts ¶¶ 18, 24, 27-29; Pl.'s State. Facts, ¶ 28); see McDonnaugh Depo., pp. 54-58, 77, 82-83, 96-97.)

After a ride-along with Plaintiff in June 2008, Penrod rated Plaintiff's selling skills as "below expectations."  Two months later, after another ride-along, Plaintiff's selling skills rating

---

[3]  The ratings from one to four, with one being the lowest and four the highest, equated to: below expectations, mostly meets expectations, meets expectations and exceeds expectations.

remained "below expectations," and his territory analysis and planning rating decreased from "meets expectations" to "mostly meets expectations."  Plaintiff's overall rating for his 2008 Mid-Year Review was "below" expectations and Penrod specifically indicated that his selling skills and territory management skills were "below" expectations.  (Doc. No. 13, Exs. G, H.)

Penrod also arranged for Plaintiff to have ride-alongs with other TSP employees, including Matt Burke, Area Director and Penrod's Manager, and John Severoni, another TSP Sales Representative. According to Burke, Plaintiff's sales message was disjointed and disorganized.  After their ride along, Burke met with Plaintiff for about 30 minutes to allow Plaintiff to practice his sales presentation. Burke suggested Plaintiff showed improvement during this period, and in his follow-up memorandum, he wrote, "Lloyd was very open to coaching, and his sales presentation did improve when he practices. On a scale of one to ten, he moved from a one to a four, a long way from being effective." Plaintiff testified that Severoni told him during their ride-along that Penrod was "critical of you . . . [s]he dosen't even know you that well." Severoni testified, however, that Plaintiff demonstrated "below par sales ability" and was "unprepared" on the day of their ride-along.  (Doc. No. 13, Ex. G; Def.'s State. Facts, ¶¶ 56, 59-61; McDonnaugh Depo., pp. 75-78, 88-91; Severoni Depo., pp., 17-18.)

When Penrod prepared Plaintiff's October 2008 FCR, she recognized some improvement, with ratings of "mostly meeting expectations," rather than "below expectations." Plaintiff, however, was placed on a Performance Management Plan ("PMP") in November 2008, and was given 90 days to improve in certain specific areas, namely "administrative responsibilities, adherence to sampling policies and procedures, territory management and selling skills[.]" Under Defendant's policy, a 90-day PMP means that, "there will be ongoing evaluation at the end of the 90-day period, there will be an evaluation of overall progress."

4

Plaintiff understood that failure to improve in these critical areas could result in termination. (Doc. No. 13, Ex. I; Def's State. Facts, ¶¶ 62, 65, 67, 68; McDonnaugh Depo., pp. 143, 150-155, 168:2-23; Pl.'s State. Facts, ¶ 58.)

While on the PMP, Penrod conducted another ride-along with Plaintiff and completed another FCR in December 2008, in which she noted ongoing performance deficiencies. Specifically, Plaintiff was reported as being "below expectations" in selling skills and as "mostly meets expectations" in territory management.  Plaintiff's last ride-along with Penrod occurred on a Friday in January 2009.   During this ride-along, Plaintiff: (1) visited the offices of two physicians without an appointment, although both required an appointment; (2) attempted to visit a physician at an office where he no longer worked, (3) walked in the wrong door at another office, and (4) called upon three physicians who did not meet with representatives on Fridays. The problems that arose during this ride-along reflected the ongoing concerns in the area of territory management.[4]  Penrod rated Plaintiff's performance in territory management and selling skills as "below expectations."   (Doc. No. 13, Ex. G; McDonnaugh Depo., pp. 189-201; Pl.'s State. Facts, ¶¶ 122-26.)

After the January 2009 ride-along, Penrod and Burke terminated Plaintiff, effective January 23, 2009, 73 days into his 90-day PMP.  Plaintiff had failed to improve his performance scores in the areas of selling skills and territory management, two of the four categories identified in his PMP.  (Doc. No. 13, Ex. I; Penrod Depo., pp. 56-57; McDonnaugh Depo., pp. 201-02.)

---

[4] The category of territory management concerns how well sales representatives are able to plan out their daily route to utilize their time most effectively while having contact with as many physicians as possible.

## II.   <u>SUMMARY JUDGMENT STANDARD</u>

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial <u>Celotex</u> burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case."  <u>Id.</u> at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record" showing a genuine issue of material fact.  Fed. R. Civ. P. 56(c)(1)(A).  To survive a motion for summary judgment, the non-moving party must refer to specific facts in the record rather than "rely[ing] on unsupported assertions, conclusory allegations, or mere suspicions."  <u>Schaar v. Lehigh Valley Health Servs., Inc.</u>, 732 F.Supp.2d 490, 493 (E.D. Pa. 2010) (citing <u>Williams v. Borough of W. Chester, Pa.</u>, 891 F.2d 458, 461 (3d Cir. 1989)).  Evidence must be viewed in the light most favorable to the non-moving party.  <u>Galena v. Leone</u>, 638 F.3d 186, 196 (3d Cir. 2011).

## III.   <u>PLAINTIFF'S RACE DISCRIMINATION CLAIM</u>

Title VII provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex or national origin[.]" 42

U.S.C. § 2000e-2(a)(1).  Section 1981 prohibits racial discrimination in the making or enforcing

of public and private contracts.[5]  The PHRA also prohibits discrimination based upon "the race,

color, religious creed, ancestry, age, sex, national origin or non-job related handicap or

disability[.]" 43 P.S. §955(a).  Under each of these statutes, claims based upon circumstantial

evidence of discrimination, such as those presented by Plaintiff, are governed by the familiar

burden-shifting framework set forth by the United States Supreme Court in McDonnell Douglas

Corp. v. Green, 411 U.S. 792 (1973).  See Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410

(3d Cir. 1999) (stating that Title VII, section 1981, and PHRA claims are analyzed under

McDonnell Douglas).

Under the McDonnell Douglas framework, the plaintiff bears the initial burden of

establishing a prima facie case of race discrimination.  Sherrod v. Philadelphia Gas Works, 57

Fed. App'x 68, 73 (3d Cir. 2003). If plaintiff successfully establishes a prima facie case, the

burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory

reason" for the unfavorable treatment.  McDonnell Douglas, 411 U.S. at 802. Once the defendant

comes forward with such a reason, plaintiff must demonstrate by a preponderance of evidence

that the articulated reason was merely a pretext for intentional discrimination.  Id. at 804.

### A.   Prima Facie Case of Discrimination

To make out a prima facie case of race discrimination, Plaintiff must demonstrate that he:

(1) is a member of a protected class; (2) was qualified for his position; (3) suffered an adverse

employment action; and (4) suffered the adverse action under circumstances that give rise to an

---

[5] Section 1981 provides that "all persons within . . . the United States shall have the same
rights in every State and Territory to make and enforce contracts . . . as is enjoyed by white
citizens[.]"

inference of discrimination.  Brown v. Boeing Co., 468 F. Supp. 2d 729, 735 (E.D. Pa. 2007).

Defendant does not dispute that Plaintiff can satisfy the first three elements of his prima facie

case, but argues that Plaintiff is unable to satisfy the fourth element and survive summary

judgment.

The fourth element of a prima facie case is intended to be flexible enough to fit the

circumstances of each type of illegal discrimination. However, the central focus remains whether

the employer is treating some people less favorably than others because of their race, color,

religion, sex or national origin. Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352 (3d Cir.

1999).  Plaintiff contends that he can satisfy the fourth prong, asserting that he is "similarly

situated" to Caucasian co-workers who received more favorable treatment.  Under this approach,

a plaintiff must be similarly situated in all relevant respects to the individuals with whom he

seeks to compare himself.  Dill v. Runyon, 1997 WL 164275 *4 (E.D. Pa. Apr. 3, 1997).

Generally, this requires "a showing that the two employees dealt with the same supervisor, were

subject to the same standards, and had engaged in the same conduct without such differentiating

or mitigating circumstances as would distinguish their conduct or the employer's treatment of

them." Opsatnik v. Norfolk Southern Corp., 335 Fed.Appx. 220, 222-23 (3d Cir. 2009).

Plaintiff points to Kevin Fay and Kristen Kindzierski as relevant comparators, neither of

whom were placed on a PMP or terminated.  Fay is a Sales Representative who is still employed

by TSP.  He reported to Penrod during the same period as Plaintiff and received similar ratings

to Plaintiff in each of the five FCRs Penrod issued during the period of August through

December of 2008.[6] Like Plaintiff, he had documented problems in the categories of territory analysis/planning and selling skills.[7] (Penrod Depo., pp. 99-100; Doc. No. 13, Exs. G, N.)

Fay, however, was new to the pharmaceutical industry and his position with TSP was his first in pharmaceutical sales.  In addition, although Fay initially experienced difficulty, his performance ultimately improved.  Fay, therefore, is not similar in all relevant respects to Plaintiff, who had six years experience in the pharmaceutical industry, including three in sales. Furthermore, Plaintiff's performance problems were more extensive than those exhibited by Fay. While Fay received "mostly meets expectations" scores in selling skills on four out of his first five FCRs, Plaintiff received "mostly meets expectations" or worse on his annual review for 2007, his Mid-Year review for 2008 and on each of his seven FCRs between March 2008 and January 2009.[8]  Consequently, Plaintiff has not sufficiently established that Fay was similarly situated to him.  (Penrod Aff., ¶¶ 11, 12; Pl.'s Stat. Facts ¶ 4; Doc. No. 13, Exs. E, F, G, H, N.)

We are also unable to conclude that Kindzierski is similarly situated to Plaintiff. Kindzierski completed fewer daily sales calls than Plaintiff and had performance issues with

---

[6] These ratings include "mostly meets expectations" in "Territory Analysis/Planning" from May until December 2008 and "mostly meets expectations" in selling skills during this same period, except for July 2008, when he was reported as "meet[ing]" expectations in this area.  (Doc. No. 13, Ex. N; Penrod Depo., pp. 99-100.)

[7] Additionally, Penrod was concerned with Fay's failure to enter his pharmacy calls into the computer system.  (Pl.'s State. Facts, ¶¶ 106, 108, 109, 111).

[8] Similarly, Fay received scores of "mostly meets expectations" scores in "Territory Analysis/Planning" on each of his first five FCRs.  Plaintiff, however, received scores of "mostly meets expectations" or worse in the areas of "Territory Management" on his annual review for 2007 and his Mid-Year review for 2008.  Plaintiff also received a score of "mostly meets expectations" or worse in the area of "Territory Analysis/Planning" between August 2008 and January 2009.  (Doc. No. 13, Exs. E, F, G, H, N.)

sample accountability and administration.[9]  Although Kindzierski experienced these performance issues periodically, her problems were not related to selling or territory management. Additionally, Kindzierski's recorded problems were not as longstanding as those of Plaintiff.[10] (Doc. No. 13, Exs. E, F, G, H, O; Penrod Aff., ¶¶ 13, 14; McDonnaugh Depo., pp. 236-237.)

Lastly, Plaintiff alleges that Penrod was critical and dehumanizing towards him in a way his previous boss, Simmons, was not.[11]  Specifically, he contends that she spoke to him in a demeaning way, looked down on him as if she was superior and treated him to a different standard.  Plaintiff suggests that even when he followed Penrod's instructions, she would still be critical.  One sales representative, Greg Crouch, suggested this differential treatment was a result

---

[9]  Kindzierski had received a "2" in compliance administration on every FCR Penrod issued to her, yet, she was not placed on a PMP. (Pl.'s State. Facts, ¶¶ 114-16).

[10] Plaintiff notes three other Caucasian sales representatives exhibited problems. However, their issues were neither the same nor as severe or prolonged as Plaintiff's ongoing deficiencies.  Dave Delgado and Brooke Durlacher experienced problems with sample accountability. Delgado was never placed on a PMP nor terminated as his problematic behavior lasted for a small amount of time. Durlacher was issued a written warning letter and then voluntarily left the company. Janine Smith had issues with selling skills, but was never placed on a PMP or terminated as her problematic behavior was short-lived.  We note, however, that the exact details of the amount of time each of these employees received negative performance reviews is not available in the record.  (Penrod Depo., pp. 48, 51-52.)

[11] We note that the record reflects that Plaintiff was replaced by Brian Velcamp, a Caucasian sales representative. (Penrod Depo., pp. 108.) Plaintiff did not raise this issue, however, we feel it is a necessary component of our analysis. While we recognize that in certain instances this type of evidence may be sufficient to make out a prima facie case, this occurs mostly in the age discrimination context. See e.g., Pivirotto v. Innovative Systems, Inc., 191 F.3d at 356-57 (replacement with someone outside Plaintiff's protected class is a more appropriate indicator in the age-discrimination context where the classification is continuous and not categorical.)  As, "the nature of the required showing to establish a prima facie case of disparate treatment by indirect evidence depends on the circumstances of the case," we must judge Plaintiff's termination and TSP's subsequent hiring of a Caucasian not in isolation, but in regard to the rest of the facts. Torre v. Casio, Inc., 42. F.3d 825, 830-31 (3d Cir. 1994). We deem this replacement evidence insufficient to establish a prima facie case.

of Plaintiff's skin color.  (McDonnaugh Depo., pp. 61:7-23, 62:2-9, 188:6-165, 68:19-69:10.)
However, Plaintiff's subjective belief that race played a role in an employment decision is
insufficient to establish an inference of discrimination.  See e.g., Jones v. United Parcel Serv.,
214 F.3d 402, 407 (3d Cir. 2000).  We are also unconvinced that the belief of a co-worker can,
without more, satisfy Plaintiff's burden.

In sum, we conclude that Plaintiff has failed to present a prima facie case to support an
inference of discrimination or otherwise establish that he was treated less favorably than other
"similarly situated" co-workers.  Nevertheless, even if Plaintiff were able to meet this burden, a
complete McDonnell Douglas analysis demonstrates that he has failed to adduce sufficient
evidence to suggest a finding of pretext.  This issue is examined below.

### B.    Legitimate, Nondiscriminatory Reason

If Plaintiff had established a prima facie case of discrimination, a proposition we reject,
the burden of production would then shift to Defendant to articulate a legitimate,
nondiscriminatory reason for its decision.  At this stage, Defendant's burden is "relatively light"
and it need only "introduc[e] evidence which, if taken as true, would permit the conclusion that
there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes v.
Perskie, 32 F.3d 759, 763 (3d Cir. 1994). Defendant asserts that Plaintiff was terminated for: (1)
failure to successfully complete the terms of his PMP; and (2) uncorrected sales deficiencies
identified by both of his managers.  Defendant argues that both of these failures demonstrate
Plaintiff's inability to sell Defendant's products the way Defendant desired.  We find that
Defendant's non-discriminatory reasons are clearly sufficient to satisfy its burden.

11

C.      **Pretext**

To survive summary judgment, Plaintiff must point to evidence from which a fact-finder could reasonably conclude that Defendant's proffered reasons are pretextual.  Fuentes, 32 F.3d at 763. This can be accomplished by adducing evidence from which a fact-finder could: (1) disbelieve the employer's articulated reasons; or (2) believe that discrimination was more likely than not a motivating or determinative cause of the employer's action. Id. at 764.

1.      *Discrediting the Proffered Reasons for Defendant's Termination*

Under this first approach of the Fuentes analysis, a plaintiff must "present evidence contradicting the core facts put forth by the employer as the legitimate reasons for its decision." Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005). In other words, Plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Fuentes, 32 F.3d at 765. In evaluating the employer's reasons, our focus is upon whether the employer's reasons honestly motivated the decision at issue, not whether the reasons are factually accurate. See Stahlnecker v. Sears, 2009 WL 661927 at *6 (E.D. Pa. Mar. 11, 2009).

Plaintiff first contends Penrod's performance assessments were inherently contradictory, suggesting that his performance was not the real reason for his termination.  Plaintiff argues that the FCRs and Mid-Year reviews were meant to summarize performance in the same categories over the same time period (the year 2008), thus the differences in the ratings he received on these reviews were "inherently contradictory."  Specifically, Plaintiff claims that his "meets expectations" score on "Product/Commercial Knowledge" in his FCRs for 2008 are inconsistent

12

with his "mostly meets expectations" score on "Functional and Product Knowledge" on his Mid-Year review for 2008. He raises the same concern regarding the difference between his "Territory Analysis/Planning" score on his FGRs, which ranged from "meets" to "mostly meets expectations," and his "Territory Management" score on his Mid-Year reviews, which was "below expectations." See (Doc. No. 13, Exs. G, H.)

Defendant contends that the FCRs do not contradict the Mid-Year assessments to establish pretext. Defendant notes that Penrod testified that the categories in each rating are not one and the same; they have different names because they serve different purposes. Indeed, there are differences between the categories of "Territory Analysis/Planning" and "Product and Commercial Knowledge" in the Field Coaching Guides and the "Territory Management" and "Functional Commercial Knowledge" categories in the performance appraisals. While the "Territory Management" category on the Mid-Year review has only three criteria, the "Territory Analysis/Planning" category on the Coaching Guide has nine criteria spanning a much wider range than "Territory Management."[12]  (Doc. No. 13, Exs. G, H.)

The same holds true for "Functional and Product Knowledge" on the Mid-Year review and "Product/Commercial Knowledge" on the FCR. The former has six criteria while the latter

---

[12] As an example, the Coaching Guide has a criteria which includes exploring new business opportunities, while the Mid-Year review is more focused on achieving objectives rather than expansion.

13

has eight. Additionally, the former tends to focus on the macro-level picture of product knowledge, including achieving sales objectives, while the latter focuses on more micro-level criteria.[13]  (Doc. No. 13, Exs. G, H.)  Given these undisputed facts, a reasonable juror would be unable to conclude that Plaintiff's performance scores, and assessments upon which they are based, reflect an inherent contradiction that suggests that Defendant's proffered reasons for his termination are unworthy of credence.

Plaintiff also claims that market share growth was the single "most important" measure of performance, and thus Defendant's reliance on other reasons to support its decision was pretextual.  In support of this argument, Plaintiff points to Defendant's Sales Competency Document, which assigns market share growth as 40% of a sales representatives' performance. (Doc. No. 13, Ex. K.)  The Sales Competency Document was not in effect during Plaintiff's employment.  However, even if we were to accept that market share was the "most important" factor in evaluating the performance of a sales representative during Plaintiff's tenure, this fact does not support a reasonable inference that Defendant's reliance upon other factors renders its articulated reasons so implausible, inconsistent, incoherent or contradictory, such that they should be disbelieved.

---

[13] As an example, where the Coaching Guide has a criteria evaluating knowledge of "competitive product characteristics, indications, efficacy," the Mid-Year review has a much more expansive criteria in this area which "demonstrates a thorough knowledge of relevant market issues and trends within assigned area; shared competitive intelligence with appropriate internal individuals or groups."

We also reject Plaintiff's contention that his objective sales performance provides a reasonable inference that Defendant's reasons are pretextual.  Plaintiff relies upon <u>Brewer v. Quaker State Oil</u>, 72 F.3d 326 (3d Cir. 1995), in which the United States Court of Appeals for the Third Circuit held that a reasonable jury could find it implausible that a defendant would fire a salesperson for alleged deficiencies that "paled in comparison to his consistently good sales performance[.]"   <u>Id.</u> at 332.   In <u>Brewer</u>, the defendant relied upon plaintiff's poor communication skills, failure to follow up with customers, insufficient time within his territory and administrative problems, but seemed to ignore the plaintiff's twenty-three years of successful sales numbers, which had in recent years included "fully acceptable" ratings and consecutive bonuses for surpassing his sales quota.  <u>See id.</u> at 330-32.  The Court determined that the defendant's articulated reasons were particularly suspect considering that plaintiff was successful in the sole area identified by defendant in its performance incentive program – sales. <u>Id.</u>   The Court also found that the reasons articulated by defendant involved "the same organizational deficiencies that the employer had tacitly accepted for over two decades."  <u>Id.</u> at 332.

<u>Brewer</u>'s facts are entirely distinguishable from the facts before us.  Although Plaintiff's sales numbers may have been "fine compared to his peers" and he was doing better than "certain members of Penrod's team[,]" (Pl.'s Br. at 23-21), his performance is not comparable to that of the plaintiff in <u>Brewer</u>, who was the only salesperson in his region to exceed his sales quota in

15

the two years preceding his termination.  <u>See</u> (Pl.'s Stat. Facts ¶¶ 92-101) (reflecting that Plaintiff was recognized for market growth, but was in the "middle of the pack" and better than four out of the nine other salespersons in his group).  Further, Plaintiff's negative performance issues, rather than being "tacitly accepted" for many years, were well documented and communicated to him on numerous occasions, both before and after he was placed on a PMP. <u>See</u> (Doc. No. 13, Exs. E, F, G, H, I.)

Plaintiff's situation is more appropriately comparable to <u>Taylor v. Amcor Flexibles Inc.</u>, 669 F.Supp.2d 501 (D.N.J. 2009), where the Court held the employer's proffered legitimate reasons for terminating the plaintiff were not a pretext for race discrimination.  In <u>Taylor</u>, the plaintiff had a record of documented performance issues and was given an opportunity to improve his shortcomings under a Performance Improvement Program. While the plaintiff's raw sales numbers were superior to other sales representatives, and he was recognized as a "good" communicator by former sales representatives, he had failed to achieve certain sales goals and had documented problems communicating effectively with other employees and certain clients. <u>See</u> <u>Taylor</u>, 669 F.Supp.2d at 507-11.

The <u>Taylor</u> Court found the employer had the right to terminate plaintiff for these reasons and suggested that business judgment in terminating a substandard employee does not display pretext. Indeed, although the Court recognized that it defied reality to separate sales numbers from other performance categories, it determined that "the deficiencies cited by [defendant]

16

directly concerned [plaintiff's] ability to maintain or increase sales in the future and [defendant's] ability to develop and execute strategies designed to maintain or increase sales in [plaintiff's] district[.]" Id. at 363-65.  Similarly, in this case, we do not consider Plaintiff's average sales numbers to constitute a reasonable basis to second-guess Defendant's proffered reasons.

Plaintiff also argues that Defendant's articulated reasons are called into question by the fact that it terminated his employment after 73 days of a 90-day PMP period, since he was improving in the areas of compliance and administration.  Plaintiff's selling skills and territory management, however, still remained below expectations and showed no improvement during the 73 days Plaintiff was on the PMP.  There is nothing in the record to suggest that the PMP constituted a guarantee of continued employment and we are unable to conclude that the timing of his termination provides reasonable basis to conclude that the reasons provided in support of his termination are unworthy of credence.  Cf. (McDonnaugh Depo., p. 161) (reflecting that he "knew [Defendant] could always take disciplinary action," but "didn't think" they would).

Lastly, Plaintiff cites to the fact that the nine representatives (including himself) who had worked under Simmons, Penrod's predecessor, were never placed on a PMP or terminated. Plaintiff asserts that "Simmons believe[d] that four [of the sales representatives] were stronger and the six others, including [Plaintiff], exhibited similar performance," thereby contradicting Penrod's assessment of Plaintiff.  (Pl.'s Resp. 20-21.)  The record reflects, however, that

17

Simmons had the same concerns as Penrod, especially regarding Plaintiff's one-sided sales style and issues in territory management.  <u>See</u> (Doc. No. 13, Ex. F.)  Thus, the performance issues that ultimately gave rise to Plaintiff's termination were documented for most of his tenure with the company, across both of his managers.  Thus, even when viewing the facts in a light most favorable to Plaintiff, we find that a jury could not conclude that Defendant's reasons for terminating Plaintiff in January 2009 were pretextual, simply because Simmons, although raising similar concerns, did not take disciplinary action against Plaintiff from August 2006 to November 2007.

We conclude, therefore, that Plaintiff has also failed to provide sufficient evidence to allow a jury to discredit Defendant's proffered reason for terminating Plaintiff.

### 2. *Evidence that discrimination was more likely than not a motivating factor in the termination*

The second-prong of the <u>Fuentes</u> test examines whether Plaintiff has evidence that suggests discrimination was more likely than not a motivating or determining factor in the employer's decision.  Plaintiff must do more then show that the employer's decision was wrong or mistaken, but must demonstrate that the employer acted with discriminatory animus.  <u>Abramson v. William Paterson Coll. of N.J.</u>, 260 F.3d 265, 283 (3d Cir. 2001).

In support of a finding of pretext under this analysis, Plaintiff once again asserts similarly situated members of Penrod's sales team–Fay and Kindzierski–were treated differently in that they were never placed on a PMP, issued written warnings or terminated, despite having similarly negative evaluations. As we have already determined in our discussion of Plaintiff's prima facie case, however, neither of these individuals are similarly situated to Plaintiff.  Thus, Defendant's treatment of these individuals is irrelevant and insufficient to establish pretext.

We conclude, therefore, that Plaintiff has failed to provide sufficient evidence to allow a jury to reasonably conclude that discrimination was more likely than not a determinative or motivating factor in Defendant's termination of Plaintiff's position.

IV.    **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment shall be granted, and Plaintiff's claims shall be dismissed. Our order follows.